Filed 11/8/24  In re Walker S. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re WALKER S., a Person Coming Under the Juvenile Court Law. | B333404 <br><br> (Los Angeles County Super. Ct. No. 22CCJP04278C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br>     Plaintiff and Respondent, <br><br>     v. <br><br> SETH S., <br><br>     Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Tamara Hall, Judge.  Reversed with directions.

Linda J. Vogel, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and David Michael Miller, Senior Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

Seth S., father of two-year-old Walker S., appeals from the juvenile court's jurisdiction findings, disposition orders, and subsequent orders terminating jurisdiction, awarding Walker's mother, Shannon L., sole legal and physical custody of Walker, and requiring Seth's visits with Walker to be monitored. Seth argues substantial evidence did not support the jurisdiction findings his history of domestic violence and violent outbursts placed Walker at substantial risk of serious physical harm. Seth also challenges the juvenile court's custody and visitation orders. We agree substantial evidence did not support the court's jurisdiction findings. Therefore, we reverse the jurisdiction findings and direct the court to vacate the custody and visitation order and dismiss the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *Shannon Takes Sedatives and Loses Consciousness While Caring for Walker; The Department Files a Petition Under Section 300*

Shannon has three children including Walker. Her ex-husband Brian L. fathered two of them: Maisy (now an adult) and Kingston (now 10 years old). Maisy lived with Shannon;

Kingston lived with both parents. Walker also lived with Shannon, and Seth visited him regularly.

The Los Angeles County Department of Children and Family Services became involved with the family in October 2022, after family members could not reach Shannon by phone. Maisy went home and found Shannon "'out of it,'" "'kind of awake' but . . . not completely all there," and incoherent. Walker, then two months old, was "fine and in his bed." Maisy called the 911 emergency operator, and paramedics took Shannon to the emergency room. The toxicology report showed Shannon had benzodiazepine in her system.[1] Shannon told the case social worker that she had taken "half an Oxycodone pill and Xanax (1 mg)" the night before paramedics took her to the hospital. Shannon also disclosed a prior voluntary case with the Department based on prescription drug abuse, but she denied current substance abuse. Shannon volunteered to drug test.

During the Department's initial investigation, Shannon told the case social worker that she and Seth were "high school sweethearts" and that they reconnected after Shannon's divorce. Shannon said that her feelings toward Seth changed and that they were no longer together, but that Seth wanted their relationship to continue. Seth expressed frustration over the relationship and said he felt "gaslighted" after they reconnected

---

[1] "The benzodiazepine class of drugs is, like alcohol, a central nervous system depressant, commonly used as a tranquilizer. Alcohol and benzodiazepines have an additive effect when used together. In addition to diazepam, another generic benzodiazepine is clonazepam. Brand names for benzodiazepines include Rivotril, Klonopin, Xanax and Valium." (*People v. Huynh* (2012) 212 Cal.App.4th 285, 292, fn. 2.)

and Shannon became pregnant.[2]  Maisy told the case social worker she had "a 'fine' relationship" with Seth, but Kingston said he did not speak with Seth because "Seth will often say rude comments to him and his mom."  Kingston said he had seen Seth and Shannon "get into 'tiny verbal arguments' but denied any physical fighting."  Shannon denied domestic violence with either Brian or Seth.

The Department filed a petition under Welfare and Institutions Code section 300, subdivision (b)(1),[3] alleging in count b-1 that Shannon had a history of substance abuse and was a current abuser of Oxycontin and Xanax and that her substance abuse rendered her unable to provide regular care for her children.  The Department alleged in count b-2 Shannon had a history of "mental and emotional problems" that rendered her unable to provide regular care for the children.  The Department also alleged in both counts Brian and Seth failed to protect their

---

[2]     "Gaslighting is a term derived from the 1944 film Gaslight and refers a kind of psychological abuse in which a person denies another person's reality and causes that person to question himself or herself and his or her perceptions."  (*Garrett v. Cape Fox Facilities Servs.* (E.D.Va., Jan. 17, 2020, No. 1:19-cv-579) 2020 WL 265869, p. 2, fn. 6; see *Commonwealth v. Gardner* (Mass. App. Ct. 2023) 102 Mass.App.Ct. 299, 304, fn. 5 ["Gaslighting is defined as 'psychological manipulation of a person usually over an extended period of time that causes the victim to question the validity of their own thoughts, perceptions of reality, or memories and typically leads to confusion, loss of confidence and self-esteem, uncertainty of one's emotional or mental stability, and a dependency on the perpetrator.'"].)

[3]     Statutory references are to the Welfare and Institutions Code.

4

respective children from Shannon.  The Department did not ask the juvenile court to detain the children.  The court released Walker to the homes of his parents under the supervision of the Department, with primary custody to Shannon and unmonitored visitation for Seth.

>    B.    *The Department Investigates*

A Department investigator interviewed members of Walker's family.  Shannon said she had taken Xanax the evening paramedics took her to the emergency room, but denied taking Xanax regularly and said she did not use Oxycodone.  Shannon said she consulted a neurologist because she was concerned about her reaction to Xanax.  Regarding count b-2, Shannon denied "a history of mental and emotional problems," but said she "has had situational anxiety related to her job (as a nurse) and the divorce but this has never negatively affected her parenting as she has raised all the kids by herself."

Shannon said Seth "has a temper and 'he flips all of a sudden' and now his anger is directed at her and 'he has gotten worse since [she does not] want to be with him' but there is a reason she does not want him around her children."  Shannon said that Seth was difficult at custody exchanges.

Seth told the Department investigator his relationship with Shannon was "chaotic at times."  Seth said he never lived with Shannon, but he spent some nights at her home when they were together.

Maisy, who was a senior in high school, told the investigator she had not seen her mother abuse prescription drugs or alcohol.  She said Shannon "'has been going through a lot with her divorce, the new baby, and Seth . . . , and she has had

her ups and downs but she has been able to function.'" Maisy said Seth "'has always had anger issues. He has screamed at my face when I wanted to deescalate the situation when he was arguing with Mom.'" Maisy also said she felt uncomfortable with Seth "[w]hen he gets his anger issues."

Kingston, who was in the third grade, said he had not seen his mother take prescription drugs or abuse alcohol. Like Maisy, Kingston was concerned about Seth. "When Seth . . . is here, there is arguing (between the mother and [Seth]). I don't know what they argue over but Seth yells over and cusses out Mom and sometimes me, a lot. Mom does not yell or cuss back. The argument would end when he'd swing and slam the door and leave. He has not thrown anything. Every time he'd come over, little or big argument, he'd not leave without an argument. A long time ago when I was 6 or 7, he used to be fine. They argued mostly when Mom was pregnant. He has never been physical. He has not done anything bad to the baby (Walker) that I know of. I am feeling safe with Mom except when Seth is over because he always makes up a fight and makes me scared. Other than Seth, I am completely fine and safe with Mom and [Brian]."

The investigator also interviewed Seth's ex-girlfriend Julia A., with whom Seth had an older child. Julia said that she and Seth lived together for six months and that Seth was sometimes abusive. "During one incident, when [Julia] woke up at 2:00 am in the morning to change her baby's diaper, [Seth] 'did not like my tone and he threw a diaper at me.'" Another time Seth "came to visit his daughter where he 'licked me all over my face aggressively while I was holding the baby and I went to the ground to protect my daughter. I called the cops but he left.'"

Julia also said Seth "has anger management issues and he could 'snap' anytime." According to Julia, Seth recently left her house in anger while holding their daughter and said, in the child's presence, "'You are dead to me.'" Julia said she had full custody of their daughter and a five-year restraining order against Seth.

The Department recommended Shannon participate in a substance abuse program, "intensive mental health services, and medication management (if needed) to stabilize her mental health condition." The Department said it did not find enough evidence to support the "failure to protect" allegations regarding Brian and Seth. But the Department said it "became concerned about [Seth's] aggressive and demeaning behavior and anger towards the mother and the [two older] children. Additionally, the Department was informed of [Seth's] little knowledge of parenting as evidenced by the way he was holding newborn Walker and his inability to console the baby during [a] home visit. To rule out drug abuse, [Seth] agreed to drug test for the Department and he tested positive for low levels of Marijuana." The Department also said that it was currently investigating a referral regarding Seth's daughter and that Seth's "anger might be anxiety-driven due to the situation he is in now as far as his relationship with the two mothers and issues related to custodial and visitation time with his children." The Department recommended Seth participate in individual counseling to address anger management and child safety, and take a parenting class and a parental conflict workshop.

C.    *The Court Detains Walker from Seth*

On February 2, 2023 the Department filed a request to detain Walker from Seth without notice. The accompanying

attorney declaration stated: "[The case social worker] is concerned about father's angry outbursts, verbal abuse to mother, and hostile and aggressive behavior toward mother. Father has demonstrated that he is unable to control his behavior and emotions when confronted with situations that he does not agree with or when others are telling him information he does not want to hear. Father has been seen handling his infant son, Walker, in ways that could harm Walker due to father being upset and angry. Father has driven his van with children (the infant Walker and a 2-year-old paternal half-sibling) in the vehicle in a very aggressive manner, skidding his tires out of the Sheriff['s] Department Station and driving at high rates of speed because he is upset after picking up the children. Father has cursed and used foul language at complete strangers who become involved at the exchanges of the children between the mother of the child and the father." The court granted the Department's request.

The following day, the Department filed an ex parte application under section 385 to modify the court's custody order. The Department again said it received reports from third parties that Seth argued with and displayed "aggressive" and "abusive" behavior toward Shannon (and in Walker's presence) during custody exchanges at the sheriff's station. The Department also said Seth "displayed aggressive and abusive behavior toward the child Walker by shaking the baby during exchange; this incident was observed by the mother and mandated reporters who were concerned enough to intervene." The Department asked the court to vacate the current custody order, detain Walker from Seth, and order monitored visitation for Seth.

The Department's detention report (filed with the ex parte application) stated that on January 22, 2023 two mandated

reporters observed Seth, Shannon, and Walker in the parking lot of the sheriff's station. One witness said she saw the family in the lobby when Shannon gave Walker to Seth and thought Shannon appeared uncomfortable. A few minutes later, in the parking lot, the witness saw Seth yelling at Shannon, who was in her car. As Shannon began to back her car out of the parking space, Seth began to shake Walker, yelling "'Here take the baby! Take him!'" The witness "noticed the baby was in distress and his little head was moving like a bobble head." The witness asked Shannon if she wanted assistance. As the witness walked toward the station, Seth cursed at her. The second witness (a visitation monitor) also saw Seth hold Walker with two hands and shake him. She said the "shaking was extreme."

The Department described Seth's recent behavior during custody exchanges as "angry and aggressive" and "hostile" toward Shannon, the case social worker, and third parties. Shannon said Seth attempted to manipulate her. Shannon sent Seth text messages (during a time when there was a nationwide shortage of baby formula) to say she needed formula. Seth purchased all the formula in a local discount department store (more than $600 worth) and told Shannon that, "if she comes over to his house and is nice to him, he will give her some of the baby formula."

The Department also reported on recent visitation. On December 4, 2022 Shannon arrived with Walker at the sheriff's station for a custody exchange. Seth saw Shannon arrive, went to her car, and got inside the car with Shannon and Walker. Seth refused to leave the car and spoke with Shannon for two hours, begging her to resume their relationship. Shannon told the social worker that she was too scared of Seth to argue or fight with him.

A few days later, Seth refused, until a sheriff's deputy intervened, to release Walker to the maternal grandmother. The Department said Seth "then drove erratic[ally] by skidding his vehicle at a high rate of speed out of the sheriff station parking lot. (The maternal grandmother took [a] video of the father doing this.)"

The case social worker spoke to Julia again in late January 2023. Julia said that when she and Seth attended a friend's wedding, Seth punched Julia in the stomach, slapped her, and jumped on top of her when she fell to the ground. Julia said witnesses intervened and pulled Seth off her.

On February 8, 2023 the court held a hearing on the section 385 petition. The Department asked the court to detain Walker from Seth because Seth "has been reported to be very inappropriate when he's dealing with the mother with Walker caught in the middle." The Department argued Seth harassed Shannon and did "not seem to respect boundaries" by, for example, getting into Shannon's car after a custody exchange and talking to Shannon at length in Walker's presence. The Department also argued that Seth had "some anger management blow-ups" and that "the last straw" occurred when witnesses observed Seth shaking Walker on January 22, 2023. Counsel for Shannon and Walker joined the Department's request and agreed the January 22, 2023 incident placed Walker in danger. Counsel for Seth said Seth "strenuously denied that he shook or held his child in an inappropriate manner during the January [22,] 2023 incident. Father will admit there was loud talking, but there was no abuse to the child or inappropriate interaction above the loud talking." Counsel for Seth asked the court to deny the Department's request to detain Walker from Seth and suggested

10

third party assistance with custody exchanges would "alleviate any conflict."

The court stated: "What is concerning is, as indicated by the facts as argued by counsel, [this is a] five-month old child and father let his anger get the best of him.· He shook the baby in such a manner where the baby's head was wobbling back and forth.· That is very dangerous for a child of this age.· He is still a newborn infant baby.  So the father's anger and his aggressiveness towards the mother, has and is placing this child in harm's way."  The court sustained the petition, detained Walker from Seth, continued Walker's placement with Shannon, and ordered Seth to have three, 3-hour monitored visits weekly, with custody exchanges to occur in the lobby of the sheriff's station.  The court also ordered the Department to assess the paternal grandmother as a monitor.

> D.     *The Department Files an Amended Petition Adding Allegations of Child Abuse and Domestic Violence by Seth; The Department Continues To Investigate*

On February 9, 2023 the Department filed an amended petition with five counts, including counts b-1 and b-2 from the original petition.  In count b-3 the Department alleged under section 300, subdivision (b)(1), that Seth had a history of domestic violence and violent conduct, including verbal and physical aggression directed toward Shannon in Walker's presence, and that Seth's violent conduct placed Walker at a substantial risk of serious physical harm.  The Department also alleged in counts b-4 and a-1 under section 300, subdivisions (a) and (b), that Seth physically abused Walker on January 22, 2023

11

by shaking him aggressively and that such physical abuse placed Walker at a substantial risk of serious physical harm.

The Department submitted a supplemental report regarding the new allegations. Seth vehemently denied shaking Walker as the Department claimed. Shannon said Seth was holding Walker with his "'arms spread out away from his body and was saying "take him, take him."'" Shannon said Seth "appeared to be frustrated that they were back and forth in their relationship and he was shaking child Walker in front of her." Shannon was "afraid" of Seth that day and "was scared enough to ask for help."

The Department obtained a police report of an incident of domestic violence between Shannon and Seth in May 2022, three months before Walker was born. Shannon said Seth asked to meet her for dinner to discuss their relationship. Shannon decided to leave and got into her car, but Seth prevented her from closing the car door. They argued for a few minutes, and Shannon began walking through the parking lot and away from Seth. Seth grabbed Shannon's arm, causing her to stop and turn toward Seth. Shannon yelled at Seth and told him to leave her alone. Shannon called the 911 emergency operator and began to walk away again, but Seth grabbed her cell phone. Seth eventually threw Shannon's phone into her car. Seth generally agreed with Shannon's account of the incident but denied grabbing her arm.

The Department said it was "gravely concerned" for Walker's safety in Seth's custody because of the January 2023 shaking incident, Seth's history of domestic violence with the mothers of both his children, his history of violent outbursts, and his apparent inability to control his anger. The Department

12

believed Seth's "conduct (shaking the baby) was a deliberate act, done consciously and intentionally to show his frustration and anger towards the mother."

The Department filed a last minute information report on March 17, 2023. The Department investigator had received and reviewed video footage from the sheriff's station taken on January 22, 2023. The investigator stated: "The video shows the father entering the parking lot and parking his car next to the mother's. He walks towards the entrance door of the Sheriff's Station that is not visible. Approximately 4 minutes later both parents exit the Station and walk back towards their vehicles. The [father] is seen holding child Walker with one arm (the other arm is free). The [father] follows the mother to her car, stands by the driver side door, and he is seen talking to the mother. The mother enters her vehicle and shuts the door while the father talks and this apparently angers the father; he is seen arguing with the mother and moving his free arm up and down. The mother exits her vehicle and engages in what appears to be an argument with the father. The father continues to argue with the mother and he is also seen talking to a bystander who walks towards the entrance door of the Sheriff['s] Station. Another bystander pulls up by the mother's vehicle and engages her into a conversation. The father places the baby in his vehicle and leaves the Station. In review of the video from that specific angle, this [investigator] did not see the father shake the baby; however, obviously the baby was present when both parents engaged in what appeared to be a verbal argument that must have been loud enough to draw the attention of bystanders."

The investigator interviewed Seth, who denied any history of domestic violence with Shannon or Julia and denied having an

13

anger management issue. Seth said that custody exchanges were sometimes difficult because he would have exchanges with both mothers at the same time. The investigator asked Seth whether he shook Walker on January 22, 2023, as reported by witnesses, and Seth strenuously denied ever shaking or hurting Walker. Seth said that on that date he suspected Walker might not be his son and confronted Shannon in the parking lot following a custody exchange. Seth recalled saying that, "if this is not my son, then stop torturing me, you can have Walker right now" and holding Walker out in front of him to give him to Shannon. Seth said he was attending anger management and parenting classes and was participating in individual counseling.

The Department concluded there was no evidence to support the physical abuse allegations in the amended petition. The Department remained concerned, however, about father's inability to control his anger in front of Walker. The Department asked the court to remove Walker from Seth and stated Seth would benefit from mental health services, including anger management and individual counseling, as well as parenting classes.

### E. *The Juvenile Court Declares Walker a Dependent Child of the Court and Removes Him from Seth*

At the March 27, 2023 jurisdiction and disposition hearing, the juvenile court dismissed the allegations regarding Shannon's substance abuse and "mental and emotional problems," both fathers' failure to protect the children (counts b-1 and b-2), and the allegations Seth physically abused Walker on January 22, 2023 (counts b-4 and a-1). As the Department had conceded in its

reports, the court found there was "no evidence to support these counts."

Regarding count b-3, the court found Seth's "hostility towards the mother, the arguments, the aggression towards the mother while the child is present, places the child at risk." The court stated that Seth's aggression and hostility, coupled with his "antic" of buying all the available baby formula from the nearest department store and then asking Shannon to come get the formula from him, was "unreasonable" and "show[ed] control and hostility and aggression towards the mother. So that is very disturbing to the court. And that shows a level of domestic violence. Domestic violence is not just physical. It is also psychological and emotional."

The court sustained count b-3, finding Seth had a "history of domestic violence and engaging in violent altercations including, but not limited to, verbal and physical aggression by repeatedly demonstrating hostile and aggressive behavior toward the mother, Shannon . . . . Further, on or about 01/22/2023, the child was exposed to a violent episode in which the father . . . shouted, berated, and cursed at the mother at the visit exchange. Such violent conduct on the part of [Seth] against [Walker] endangers the child's physical and emotional health and safety and places the child at risk of severe physical and emotional harm, damage and danger."

The court declared Walker a dependent child of the juvenile court and placed him with Shannon under the supervision of the Department. The court removed Walker from Seth and ordered Seth to have monitored visitation in a neutral setting and, over the Department's objection, permitted the paternal grandmother to monitor the visits. The court ordered Seth to take classes

15

(parental conflict workshop, anger management, developmentally appropriate parenting) and participate in individual counseling. The court ordered Shannon to join a parental conflict workshop, participate in individual counseling, attend a full drug and alcohol program, and submit to random or on-demand drug and alcohol testing. Seth timely appealed from the court's jurisdiction findings and disposition orders.

F.     *The Juvenile Court Conducts Further Proceedings*

The Department filed an application under section 388 asking the court to modify its monitored visitation order to require a professional monitor. The Department's application included declarations from the maternal grandmother and Shannon, who said Seth appeared to be emotionally unstable. The juvenile court ordered Seth to have a psychological evaluation and suspended his visits with Walker pending review of the evaluation and a further hearing.

The psychological expert reported that Seth's Personality Assessment Inventory profile was "within normal limits" and that Seth showed an interest in treatment.[4] She said she "specifically looked at the scale of Aggression and its subscales of Aggressive Attitude, Verbal Aggression, and Physical Aggression. These were all low, i.e., right at the mean for the normal population. The Violence Potential Index was also very low, with

---

[4]     A Personality Assessment Inventory is a test "designed to reveal abnormal psychology or mental illness, and assesses a person's personality structure." (*People v. Saldana* (2018) 19 Cal.App.5th 432, 450.) According to the expert, a Personality Assessment Inventory "is very useful in evaluations of this type, as it evaluates amenability to treatment and also violence potential risk."

16

a T-score of 43, which is below the mean for the average population." Regarding Seth's diagnoses and treatment, the expert concluded: "Clinical interviewing and testing . . . did not result in mental health diagnosis, nor personality disorder diagnosis. Personality has normal variation, and it seems to me that he is man who is excitable and had poor control of emotion." The expert recommended Seth continue with individual counseling.

At a June 7, 2023 hearing counsel for Seth argued that, in light of the expert psychologist's findings, there was no evidence to suggest Seth posed a risk of harm to Walker. The juvenile court, however, stated the expert report did "not convince the court regarding the father's mental status in light of the text messages that he sent and his behavior toward the child." The court ordered Seth to have two, 3-hour monitored visits weekly in a therapeutic setting or three, 3-hour visits weekly in the Department's office with a Department-approved monitor. On June 26, 2023 the family court issued a one-year domestic violence restraining order against Seth protecting Shannon, her two older children, and the maternal grandmother.

During the next period of supervision, Seth complied fully with his case plan and tested negative for drugs and alcohol. The Department said, however, Seth would benefit from "additional anger management services to better practice the coping skills taught in the programs" and from additional child development classes. Seth consistently visited Walker and always arrived with food, toys, a playpen, and other supplies. The Department said Seth "actively engage[d] with the child through play" and provided "affection to the child by hugging, [carrying] him, singing, and telling the child how much he loves him." According

17

to the Department, Seth had "shown effort in being a present father in the life of the child."

The Department recommended the juvenile court terminate jurisdiction and award Shannon sole legal and sole physical custody of Walker. After a contested hearing in November 2023, the court ruled the conditions justifying dependency jurisdiction under section 300 no longer existed and were not likely to exist if the court withdrew supervision. (§ 364, subd. (c).) The court terminated jurisdiction, awarded Shannon sole legal and sole physical custody of Walker, and ordered monitored visitation for Seth. Seth appealed.

**DISCUSSION**

A.    *Applicable Law and Standard of Review*

Section 300, subdivision (b)(1), "allows a child to be adjudged a dependent of the juvenile court when '[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of a custodian with whom the child has been left.' A jurisdiction finding under section 300, subdivision (b)(1), requires the Department to prove three elements: (1) the parent's or guardian's neglectful conduct or failure or inability to protect the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re Cole L.* (2021)

18

70 Cal.App.5th 591, 601; see *In re Gilberto G.* (2024)
105 Cal.App.5th 52, 61-62.)

Section 300 requires proof a child is subject to the defined risk of harm at the time of the jurisdiction hearing. (*In re Gilberto G.*, *supra,* 105 Cal.App.5th at p. 62; *In re M.D.* (2023) 93 Cal.App.5th 836, 848-849; *In re Cole L.*, *supra,* 70 Cal.App.5th at pp. 601-602.) But the "court 'need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child.' [Citation.] And a parent's ""[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue."' [Citation.] However, "'[t]o establish a defined risk of harm at the time of the hearing, there 'must be some reason beyond mere speculation to believe the alleged conduct will recur.""" (*In re S.F.* (2023) 91 Cal.App.5th 696, 712-713; see *Gilberto G.*, at p. 62.)

"'We review the jurisdictional findings for substantial evidence. [Citation.] We consider the entire record, drawing all reasonable inferences in support of the juvenile court's findings and affirming the order even if other evidence supports a different finding.'" (*In re L.B.* (2023) 88 Cal.App.5th 402, 411-412; see *In re Gilberto G.*, *supra,* 105 Cal.App.5th at p. 62.) Substantial evidence, however, is not synonymous with any evidence. (*Gilberto G.*, p. 62; *In re B.D.* (2024) 103 Cal.App.5th 315, 323.) "A decision supported by a mere scintilla of evidence need not be affirmed on appeal. [Citation.] Furthermore, [w]hile substantial evidence may consist of inferences, such inferences must be a product of logic and reason and must rest on the evidence [citation]; *inferences that are the result of mere speculation or conjecture cannot support a finding* [citations]. [Citation.] The ultimate test is whether it is reasonable for a

trier of fact to make the ruling in question in light of the whole record." (*B.D.*, at pp. 323-324, internal quotation marks omitted; see *Gilberto G.*, at p. 62.) "'We do not consider the credibility of witnesses or reweigh the evidence.'" (*L.B.*, at p. 412; see *Gilberto G.*, at p. 62.)

B. *Substantial Evidence Did Not Support the Jurisdiction Findings Based on Domestic Violence*

Seth contends substantial evidence did not support the allegation Seth had a history of domestic violence and violent outbursts that created a substantial risk of serious physical harm to Walker. Seth concedes he engaged in verbal arguments with Shannon, but argues the Department offered no evidence he ever engaged in physical violence. He's mostly correct.

"Exposure to domestic violence may serve as the basis for dependency jurisdiction." (*In re Cole L.*, *supra*, 70 Cal.App.5th at p. 602; see *In re R.C.* (2012) 210 Cal.App.4th 930, 941.) But "[c]ases have made it abundantly clear that evidence of prior domestic violence between a mother and father, in and of itself, will not support jurisdiction under section 300, subdivision (b)(1)." (*In re S.F.*, *supra*, 91 Cal.App.5th at p. 714; see *In re B.H.* (2024) 103 Cal.App.5th 469, 482 ["Past incidents of domestic violence alone . . . cannot support a jurisdiction finding based on domestic violence."].) It is a child's presence in the vicinity of the parents' violent conduct that creates the substantial risk of serious physical harm to the child required for jurisdiction under section 300, subdivision (b)(1). (See *Cole L.*, at p. 603 [children may be injured if present during parents' physically violent fights]; *In re Daisy H.* (2011) 192 Cal.App.4th 713, 717 [physical violence between parents may support

20

dependency jurisdiction, but only if the violence has "directly harmed the child physically or placed the child at risk of physical harm"], disapproved on another ground in *In re D.P.* (2023) 14 Cal.5th 266, 278.) Moreover, dependency jurisdiction is unwarranted unless domestic violence is "ongoing or likely to continue." (*Daisy H.*, at p. 717; see *B.H.*, at p. 482.)

Seth argues "the evidence shows no violence against [Shannon]. Period." Not quite. Before Walker was born, Seth grabbed Shannon's arm during an argument to prevent her from walking away from him. Shannon was not injured. This single incident of physical contact, however, did not support dependency jurisdiction because it was remote in time and did not create a risk of harm to Walker. (See *In re Cole L.*, *supra*, 70 Cal.App.5th at pp. 604-605 [substantial evidence did not support dependency jurisdiction where an incident of pushing and shoving occurred outside the presence of children]; *In re Daisy H., supra*, 192 Cal.App.4th at p. 717 [substantial evidence did not "support a finding that past or present domestic violence between the parents placed the children at a current substantial risk of physical harm" because the "physical violence between the parents happened . . . years before the [filing of] the petition," and there was no evidence the children were present when the violence occurred].) And aside from that single (and relatively minor) incident, there was no evidence (let alone substantial evidence) to support the Department's allegation Seth "engag[ed] in violent altercations" and exposed Walker to "violent conduct." Indeed, Shannon and her two older children consistently denied Seth was ever physically violent. (See *In re M.W.* (2015) 238 Cal.App.4th 1444, 1454 [substantial evidence did not support dependency jurisdiction where a single incident of domestic

21

violence occurred several years before the hearing and there was no other evidence of altercations between the parents].)

True, Seth and Shannon argued, including during the dependency proceedings.  The evidence was that Seth (and sometimes Shannon) engaged in yelling, name-calling, cursing, and verbal harassment in Walker's presence during custody exchanges.  There was no evidence, however, linking Seth's verbal aggression to any physical aggression or other conduct that placed Walker at a substantial risk of serious physical harm. (See *In re B.H.*, *supra*, 103 Cal.App.5th at p. 483 [evidence of mother's "verbally aggressive," "rude or profane" behavior toward father did not show a substantial risk of physical harm to the children]; *In re S.F.*, *supra*, 91 Cal.App.5th at p. 715 [father's threatening text messages to mother were "not evidence of an "'identified, specific hazard in the child's environment" that poses a substantial risk of serious physical harm to him'"].)

The Department relies on claims by Seth's ex-girlfriend Julia of domestic violence in her relationship with Seth and argues "past violence in a relationship is a good predictor of similar behavior in the future."  The latter statement is true as a general proposition.  (See, e.g., *In re B.H.*, *supra*, 103 Cal.App.5th at p. 482 [past incidents of domestic violence may be "a predictor of future violence"]; *In re T.V.* (2013) 217 Cal.App.4th 126, 133 ["A parent's past conduct is a good predictor of future behavior."].)  But it is speculative to conclude from that evidence that Seth will likely engage in domestic violence with Shannon in Walker's presence, and create a substantial risk of serious physical harm to him, in the future because he has engaged in domestic violence with Julia outside the presence of their child, particularly where the Department provided no evidence Seth

22

has ever been physically violent in Walker's presence.  (See *B.H.*, at pp. 482-483 [substantial evidence did not support jurisdiction findings where "there is simply no evidence of any ongoing domestic violence between father . . . and mother, nor is there evidence showing a likelihood past violence will recur"]; see also *Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397, 420 ["'Speculation or conjecture alone is not substantial evidence.'"].)

Finally, the juvenile court found that the January 22, 2023 incident was a "violent episode" that endangered Walker's "emotional health and safety" and placed him at risk of severe "emotional harm, damage and danger."  This or similar conduct may have supported dependency jurisdiction under section 300, subdivision (c), had the Department alleged and proved Walker was "suffering serious emotional damage, or [was] at substantial risk of suffering serious *emotional* damage."  (See *In re B.H.*, *supra*, 103 Cal.App.5th at p. 483, fn. 6.)  But the Department did not allege, and the juvenile court did not make findings for, jurisdiction under that subdivision of section 300.  And as discussed, the juvenile court dismissed the count under section 300, subdivision (a), for lack of evidence.

Seth obviously has some anger issues.  Hopefully, he is continuing with individual counseling, working on controlling his emotions, and learning that yelling at everyone won't make the situation any better.  But, with one exception years ago, he has not used force with Shannon, and he has never engaged in physical violence in Walker's presence.  Seth's behavior around Shannon was unacceptable, but it did not create a substantial risk of serious physical harm to Walker.

23

## DISPOSITION

The juvenile court's jurisdiction findings under section 300, subdivision (b), are reversed.  The court is directed to vacate the jurisdiction findings and the custody and visitation order and to dismiss the petition.

SEGAL, J.

We concur:

MARTINEZ, P. J.

FEUER, J.